# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                Case No. 12-CR-24

**KELVIN JONES**
    **Defendant.**

## SENTENCING MEMORANDUM

Defendant Kelvin Jones pleaded guilty to money laundering, contrary to 18 U.S.C. § 1957, and I set the case for sentencing. In imposing sentence, the district court first calculates the advisory sentencing guideline range, then decides any guideline departure motions, and, finally, determines the ultimate sentence under all of the factors set forth in 18 U.S.C. § 3553(a). United States v. McBride, 789 F. Supp. 2d 1024, 1024 (E.D. Wis. 2011); U.S.S.G. § 1B1.1; see also Nelson v. United States, 555 U.S. 350, 351 (2009); Gall v. United States, 552 U.S. 38, 49-50 (2007); Rita v. United States, 551 U.S. 338, 351 (2007). In this memorandum, I first set forth the facts of the case then explain my determinations on these three issues.

### I. FACTS

In an effort to conceal his activities from law enforcement, Mazio Black, a large-scale drug trafficker, enlisted a Chicago-based tour bus company to transport money and drugs for his organization. In addition to the drivers, Black's organization paid a number of individuals to pose as legitimate passengers. These individuals would typically board the buses in Chicago and travel to Detroit, where the buses would be loaded with large travel bags packed with drug money. After obtaining the money, the buses would travel to Arizona to pick up

marijuana, then travel back to Detroit to drop off the bags of marijuana before returning to Chicago.

Defendant was one of the regular paid passengers.[1] In January 2007, he and one of the bus drivers staged a robbery of one of the buses. Defendant enlisted two or three others to help, telling them where the bus would be making a stop on its way to Arizona. The robbers waited at that location and boarded the bus when it arrived. One of the robbers, according to plan, hit the bus driver in the head with the butt of a gun and remained at the front of the bus, gun in hand, while another robber loaded the money filled bags from the luggage compartment into his truck.

Days after the robbery, defendant met the robbers at a prearranged location outside of Chicago and retrieved the stolen money, which totaled approximately $1.5 million. Defendant drove the money to Milwaukee and placed it in a storage unit he had rented. Over the next several weeks, he paid a small amount of the money to his accomplices. He also bought a Jaguar from a dealership in Chicago; approximately $60,000 worth of electronics and furniture; and just over $26,000 for several items from a jeweler in Milwaukee. These purchases from the jeweler, see 31 U.S.C. § 5312(a)(2)(N), formed the basis for the offense of conviction.

Defendant's lavish purchases drew the attention of law enforcement. Agents seized the balance of the money from the storage unit (about $1.3 million) and approached defendant, who agreed to cooperate, revealing the source of the funds and identifying the owner of the tour bus company. Agents subsequently conducted surveillance of the buses, seizing $1.4 million from a Tucson drop house and $1.1 million from one of the buses. The bus company

---

[1] Defendant's father was apparently one of the drivers, and he recruited defendant to ride the bus to make some extra money.

2

owner later agreed to cooperate, allowing the government to prosecute others in the drug trafficking organization.

## II. DISCUSSION

**A.      Guideline Calculation**

The money laundering guideline, U.S.S.G. § 2S1.1, provides two methods of calculating the base offense level. Section 2S1.1(a)(1) applies to "direct" launderers, i.e., those who committed the underlying offense from which the laundered funds were derived. It directs the court to plug in as the base offense level the offense level for the underlying offense. Section 2S1.1(a)(2) applies to "third-party" launderers, i.e., those who did not commit the underlying offense but rather were given the funds to launder. For these defendants, the base level is 8 plus a number of levels from the table in U.S.S.G. § 2B1.1 corresponding to the value of the laundered funds. See, e.g., United States v. Menendez, 600 F.3d 263, 267-68 (2d Cir.) (discussing the operation of this guideline), cert. denied, 131 S. Ct. 242 (2010).

In their plea agreement in this case, the parties agreed that U.S.S.G. § 2S1.1(a)(1) applied, and that the underlying offense level should be determined under U.S.S.G. § 2B1.1. As the government later explained, this was so because defendant was involved in the underlying offense from which the funds were derived (i.e., the staged robbery), which was best described as the interstate transportation of stolen money, 18 U.S.C. § 2314. The government therefore argued that the base offense level under U.S.S.G. § 2S1.1(a)(1) should be set at 22: base level 6, U.S.S.G. § 2B1.1(a)(2), plus 16 levels because the "loss" amount, i.e., the amount of stolen funds involved, exceeded $1,000,000, U.S.S.G. § 2B1.1(b)(1)(I). After adding 1 level under U.S.S.G. § 2S1.1(b)(2)(A) because defendant was convicted under 18 U.S.C. § 1957

3

and subtracting 3 levels under U.S.S.G. § 3E1.1 for acceptance of responsibility, the government advocated a final offense level of 20. Coupled with defendant's undisputed criminal history category of IV, this produced a guideline range of 51-63 months.

Defendant's pre-sentence report ("PSR") applied § 2S1.1(a)(1), but it calculated the underlying level under U.S.S.G. § 2B3.1, the robbery guideline. This produced an offense level of 30: base level 20 under U.S.S.G. § 2B3.1(a), plus 6 because a firearm was used, U.S.S.G. § 2B3.1(b)(2)(B), and plus 4 because the loss amount was between $800,000 and $1,500,000, U.S.S.G. § 2B3.1(b)(7)(E). Adding 1 under U.S.S.G. § 2S1.1(b)(2)(A) and subtracting 3 under U.S.S.G. § 3E1.1, the PSR came up with a final level of 28, producing a range of 110-137 months.

In his objections to the PSR, defendant initially argued that U.S.S.G. § 2S1.1(a)(2) should be used, but he later withdrew that contention, agreeing that this was a "direct" laundering case and that U.S.S.G. § 2B1.1 should be used to calculate the base level. However, he maintained an objection to the loss amount under U.S.S.G. § 2B1.1(b)(1), essentially arguing that there was no loss here because the "victim" was a drug trafficking organization. He therefore suggested a final level of 4 (base level 6, U.S.S.G. § 2B1.1(a)(2), plus 1 under U.S.S.G. § 2S1.1(b)(2)(A), minus 3 under U.S.S.G. § 3E1.1), producing a range of 2-8 months. In the alternative, he argued that the loss should not exceed $200,000, the amount he spent/laundered.[2]

I agreed with the PSR and the parties that this was a direct laundering case under

---

[2] Under this approach, the final level would have been 14 or 16: base level 6, U.S.S.G. § 2B1.1(a)(2), plus 10 or 12 for loss, U.S.S.G. § 2B1.1(b)(1)(F) or (G), plus 1 under U.S.S.G. § 2S1.1(b)(2)(A), and minus 3 under U.S.S.G. § 3E1.1.

4

U.S.S.G. § 2S1.1(a)(1), as it was undisputed that defendant participated in the underlying offense that produced the funds, i.e., the staged robbery of the tour bus. I also agreed with the parties that the underlying offense level was properly determined under U.S.S.G. § 2B1.1, rather than U.S.S.G. § 2B3.1. While I understood the PSR's decision to use the latter guideline, because the "robbery" involved in this case was staged (the driver was in on it) it made more sense to apply the theft/embezzlement guideline; defendant's specific conduct of transporting the stolen funds from Illinois to Wisconsin also fit within 18 U.S.C. § 2314, which is a listed offense in the commentary to U.S.S.G. § 2B1.1.

I rejected defendant's contention that the loss amount should be set at zero – or no more than $200,000 – under U.S.S.G. § 2B1.1. As the government pointed out, once the court decided to use U.S.S.G. § 2S1.1(a)(1), it had to apply all of the provisions of U.S.S.G. § 2B1.1 to the underlying offense – interstate transportation of stolen funds. See U.S.C. § 1B1.5(b). Defendant agreed, as a factual matter, that he transported $1.5 million, which triggered the 16 level enhancement under U.S.S.G. § 2B1.1(b)(1); that he only spent/laundered $200,000 did not matter under U.S.S.G. § 2S1.1(a)(1).[3]

Defendant argued that the loss amount could be set as zero because Black was not a "victim" who suffered "pecuniary loss." Specifically, he objected to the references in ¶¶ 15 and 18 of the PSR that he stole money "from Mr. Black." Defendant argued that this made it sound like Black was in possession of legitimate funds and was the victim of a crime. The PSR was descriptively accurate; defendant, through his accomplices, stole this money from Black's drug organization; that Black had unclean hands, too, did not change this fact.

---

[3]Had the level been determined under U.S.S.G. § 2S1.1(a)(2), the amount defendant laundered would have been relevant under the U.S.S.G. § 2B1.1 loss table.

5

Nor could I accept defendant's legal argument under U.S.S.G. § 2B1.1(b)(1). Defendant cited no authority for the proposition that because Black was a criminal he could not be a victim who suffered pecuniary loss. Under this guideline, a victim is any person "who sustained any part of the actual loss" or "any individual who sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1 cmt. n.1. Nothing in the note excludes those who lost money obtained through illegal means. Nor is there anything in the guideline excluding from the term "pecuniary loss" money obtained illegally. See U.S.S.G. § 2B1.1 cmt. n.3(A)(iii).

Defendant noted that Black's organization distributed a lot of drugs, and that Black murdered or had murdered potential witnesses, had reconstructive surgery in Mexico to avoid detection, and tried to escape several times after he was caught. But defendant failed to explain how this meant that, as a matter of law, Black could not be a victim.

Defendant stated that at the time he stole Black's money he had no idea who Black was or he probably would have reconsidered. He also noted that the government recovered $1.3 million of the money he stole. These were all relevant considerations under 18 U.S.C. § 3553(a), but defendant failed to explain how they affected the guidelines. This was not a case where defendant returned money to the victim before the offense was detected, which might trigger a credit against loss under the guideline. See U.S.S.G. § 2B1.1 cmt. n.3(E). Likewise, while the fact that he immediately confessed and cooperated was relevant in determining the sentence under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(a), it did not affect the guidelines.

For these reasons and those stated on the record, by the probation officer in the PSR addendum, and in the government's sentencing memo, I overruled defendant's objections as indicated. Accordingly, defendant's challenges to ¶¶ 27 and 31 of the PSR failed as well. I calculated the offense level as follows under U.S.S.G. § 2S1.1(a)(1): base level 6 under

6

U.S.S.G. § 2B1.1(a), plus 16 for the loss amount under § 2B1.1(b)(1); 1 level added under U.S.S.G. § 2S1.1(b)(2)(A); and 3 levels subtracted under U.S.S.G. § 3E1.1, for a final level of 20.

Finally, defendant objected to the child support arrears set forth in ¶ 55 of the PSR. He stated that the numbers were not accurate, and that he was working with three of the mothers for waiver of some, and perhaps all, of the arrears. The PSR addendum indicated that the support arrears noted in these paragraphs came from the Milwaukee County Child Support Agency, reflecting balances as of May 31, 2012. A defendant cannot object to a PSR by simply denying its truth; he has to submit some evidence. See United States v. Mustread, 42 F.3d 1097, 1101-02 (7th Cir. 1994). Defendant failed to do that here. Although it seemed possible that he could obtain forgiveness for some of this amount at some point, the figures in the PSR appeared accurate. I therefore overruled this objection.

It appeared that the other clarifications noted in defendant's objections had been made in the revised PSR. I otherwise adopted the PSR's factual statements as my findings of fact and guidelines as follows: offense level 20; criminal history category IV; 51 to 63 months imprisonment; 1 to 3 years supervised release; and $7500 to $75,000 fine

**B.	Departure Motion**

The government moved for a departure under U.S.S.G. § 5K1.1 based on defendant's cooperation. In ruling on such a motion, the district court considers:

> (1) . . . the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;

7

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; [and]

(5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a). The court gives substantial weight to the government's evaluation of the extent of the defendant's assistance, U.S.S.G. § 5K1.1 cmt. n.3, but the extent of the departure is within the court's discretion. In attempting to quantify such a departure, I typically use the method suggested by the Seventh Circuit of granting something on the order of a 2-level adjustment for each factor found to be fully present, with a lesser reduction for those factors partially present. McBride, 789 F. Supp. 2d at 1025 (citing United States v. Seib, 555 F. Supp. 2d 981, 985 (E.D. Wis. 2008); United States v. Matthews, 463 F. Supp. 2d 916, 918 (E.D. Wis. 2006)).

The parties fully discussed the nature of defendant's cooperation in their submissions. Essentially, after the government seized the stolen money from defendant's storage unit, case agents approached defendant and he agreed to cooperate, identifying the operator of the bus company used to transport drugs and money. He also identified the garage where the buses were kept. Agents then conducted surveillance of the tour buses, observing how the operation worked. Agents ultimately executed a search warrant at a drop house in Tucson, seizing bags taken from the bus filled with cash, a total of approximately $1.4 million. They also seized a total of approximately $1.1 million in cash from one of the buses. Thus, defendant's cooperation resulted in the seizure of more than $2.5 million in cash and also led to the indictment of the bus company operator, who in turn cooperated against Black's organization.

Under the first U.S.S.G. § 5K1.1 factor, I awarded 1 level, as defendant's assistance was significant and useful in allowing the identification of the bus company used to transport

8

drugs and money, ultimately resulting in the seizure of cash. However, the actual arrests and seizures required substantial additional work by case agents, so I could not say that defendant's assistance was instrumental or critical in that; the bus company operator himself decided to cooperate, allowing the government to prosecute higher-ups. Under the second factor, I awarded 2 levels, as the government found defendant's information truthful and reliable, corroborated by other aspects of the investigation. I granted 1 level under the third factor, as the assistance was limited to providing information. He did not engaged in pro-active assistance, such as making buys or wearing a wire; nor did he testify in court. I also awarded 1 level under the fourth factor, as defendant placed himself in some danger by cooperating. This case involved the theft of money from a dangerous drug dealer, and defendant's cooperation was revealed to other defendants in the organization. Two levels was not warranted, as there was no evidence of actual threats or injury. Finally, I awarded 2 levels under the fifth factor, as defendant cooperated right away when approached, which allowed agents to conduct successful surveillance of the tour buses and seize a lot of money. Therefore, I granted a total reduction of 7 levels.

**C.     Section 3553(a)**

   **1.     Sentencing Factors and Methodology**

Section 3553(a) directs the sentencing court to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional

9

treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the [advisory] sentencing [guideline] range[;]

(5) any pertinent policy statement ... issued by the Sentencing Commission[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). After considering these factors, the court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Id.

The guidelines serve as the starting point in making this determination, see Gall, 552 U.S. at 49, but the district court may not presume that a guideline sentence is the correct one, Nelson, 555 U.S. at 352 (2009); Rita, 551 U.S. at 351, or place "a 'thumb on the scale favoring a guideline sentence.'" United States v. Pennington, 667 F.3d 953, 958 (7th Cir. 2012) (quoting United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007)). Rather, the court must make an independent determination, considering the particular circumstances of the case, the types of sentences available, and the arguments of the parties. See Gall, 552 U.S. at 49-50.

**2. Analysis**

    **a. The Offense**

As discussed above, defendant participated in the theft of $1.5 million from a drug trafficking organization. After obtaining the money from his accomplices, he transported it to Milwaukee, placing it in a rented storage unit. He then used the money to purchase various luxury items, including expensive jewelry.

10

As discussed in the PSR, on February 6, 2007, defendant went to a jeweler and told the co-owner he wanted to buy a charm and ring for the upcoming NBA All Star game in Las Vegas. He told the jeweler he wanted to limit how much he spent at once because he did not want to have an IRS form with his information listed. He bought a "KJ" pendant and necklace for $9504, making a $500 cash payment. He returned to the jeweler the next day and paid an additional $6000 towards the pendant. That same day, he purchased a matching "KJ" ring for $3168 and a pair of diamond earrings for $4498. He paid the entire $3168 for the ring with cash and made a $1000 cash down payment on the earrings. Two days later, he returned to the jeweler and paid the remaining balances on the diamond earrings and "KJ" pendant and necklace, totaling $3498 and $3004, respectively.

On February 14, 2007, defendant returned to the jeweler and purchased $6500 in diamonds to be added to his "KJ" pendant. He paid the entire $6500 in cash that day. The PSR in ¶ 14 included a chart summarizing defendant's purchases of jewelry with the stolen money. Case agents recovered from the storage unit approximately $1,300,000 of the $1,500,000 defendant stole; he spent the other $200,000.

### b. The Defendant

Defendant was thirty-six years old, with a prior record including convictions for battery in 1998, arising out of an incident in which he slapped and punched a female victim in the head and face; disorderly conduct in 1998, arising out of an incident in which he shouted at the victim, threatened to injure her, pounded on her front door, kicked a panel out of a screen door, and threatened to come over to her home with a gun and shoot the house up; and theft in 2006, arising out of an incident in which he stole tires from the Wal-Mart store where he was employed. He received sentences of 30 days in jail on the 1998 cases and was placed on

11

probation for one year on 2006 case. He was on probation for the theft case when he committed the instant offense in 2007. In 2011, after his commission of the instant offense (but before he was charged), he was convicted of several counts of failure to support his children. The state court sentenced him to probation with 12 months condition time on the failure to support cases, and he was on state supervision at the time I sentenced him in this case.

Defendant reported a good childhood, with two involved parents, both of whom worked and saw that his needs were met. His mother told the PSR writer that he was a good child who did not get into trouble. She felt his biggest problem was his child support arrears, which he had begun to address since he found work in March 2012. She was not sure how he became involved with Black or his organization, but "one thing led to another" and defendant felt taking the drug money was an easy way to make money. (PSR ¶ 50.) In his sentencing memo, defendant explained that his father was a bus driver and recruited defendant to ride the bus and make some extra money. This eventually led to the idea to commit this staged robbery.

I acknowledged the temptation to steal for someone in financial difficulty involved in the transportation of so much cash. However, it was notable that defendant did not spend any of the money paying down his child support arrears; instead, he spent it on luxury items for himself. According to the PSR, defendant had thirteen children with nine different women and owed more than $100,000 in back child support. Defendant was apparently making efforts to have some of that waived or forgiven, but by any measure it was a lot of money, and his failure to pay led to felony convictions. He only reported six children to the PSR writer, stating that he thought he was only supposed to disclose the children under his care. The PSR writer through his investigation discovered the others. The PSR also reported that defendant's oldest son currently faced homicide charges. To his credit, defendant had been making regular support

12

payments since recently becoming employed.

Looking to his correctional needs, defendant did not appear to have any mental health or substance abuse issues. He should complete his education. Since March 2012, he had worked as a supervisor for van drivers at Brighter Horizons, and the court received a positive letter from his employer. His work record was otherwise patchy. His last job before the current one was at Wal-Mart from 2000 to 2005, but he was fired for stealing. He reported working as a disc jockey during periods of unemployment and to supplement his income. It did appear that he usually adjusted well to supervision, as discussed in ¶ 91 of the PSR. He did well on bond in this case.

### c. The Guidelines and Purposes of Sentencing

The guidelines recommended 24-30 months, after the departure, and the government recommended a term of imprisonment within the range;[4] defendant asked for probation. I agreed with the government that a period of confinement was needed to satisfy the purposes of sentencing in this case. The robbery defendant arranged, even though it was staged, created a potentially dangerous situation for those on board the buses. It also involved a large amount of money. That defendant spent the money on jewelry for himself, rather than supporting his children, did not speak well of his character. I also had to consider defendant's prior record, which included violent conduct and theft from an employer (which suggested that he was willing to steal when the opportunity arose).

Defendant's suggestion of a probationary term was insufficient. In making this recommendation, he argued that the PSR's guideline calculations were too high. As discussed

---

[4]In its memo, the government recommended a 4-level departure, producing a range of 33-41 months, and a sentence at the low end.

13

above, I adopted a much lower range than the PSR recommended. In any event, under defendant's proposed calculations, set forth on page three of his memo, there was no accounting either for the robbery or the large amount taken. Even if I had agreed with him that the base level should be 6, and that there should not, technically, be a loss amount, under § 3553(a) I could not ignore the fact that defendant admittedly staged the armed robbery of $1.5 million.[5] In sum, to say that this crime was comparable in severity to an offense level of 4, with a range of 2-8 months, as defendant did, would totally fail to account for the nature and seriousness of the offense under § 3553(a).

Defendant also noted that he was convicted of an illegal monetary transaction, not robbery. However, he admitted, as a factual matter, his role in the robbery, and under 18 U.S.C. § 3553(a) and § 3661 the court is not strictly limited to considering the offense of conviction. I also did not see the relevance of the fact that the government waited until a few weeks before the statute of limitations ran to indict him. Nor could I accept the notion that this was "free money" or like winning the lottery; even staged robberies can go bad, especially when firearms are involved. That defendant continued to think this way – that opportunity justified theft, as he apparently did when he stole tires from Wal-Mart – meant that prison was needed to promote respect for the law and to specifically deter him. I also had to consider the fact that he committed the instant offense while on probation in the 2006 theft case; while he had been doing well on state probation on the 2011 cases (and on bond in this case), I could not find probation alone sufficient to protect the public from further crimes.

There were some positives to consider, supporting a sentence below the range.

---

[5]It is a minor point, but I also note that under defendant's figures he would not be eligible for the third level off under U.S.S.G. § 3E1.1(b).

14

Defendant performed well on bond in this case. He had been working for about nine months, making child support payments. His claims about being a hard-working family-oriented man did not square with the record, but he had been doing better lately, I agreed. I received a positive letter from his sister, and several family members appeared in support at the sentencing hearing. He cooperated with the government, as discussed in the defense memo and the government's motion. This cooperation ultimately permitted the government to break up the Black organization and prosecute the bus owner. The district court may consider a defendant's cooperation with the government as a basis for a reduced sentence under § 3553(a), see United States v. Knox, 573 F.3d 441, 453 (7th Cir. 2009), although in this case the government filed a formal U.S.S.G. § 5K1.1 motion, which accounted for the assistance.[6]

Before the conditional jail time he served on the 2011 child support cases, which came after he committed the instant offense, defendant had never served more than 30 days. Generally speaking, a lesser sentence will suffice to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend. See United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005). I also took into account the fact that the staged nature of the robbery made it less dangerous than a "real" robbery.

Under all the circumstances, I found a sentence of 12 months and 1 day sufficient but

---

[6]At the sentencing hearing, defendant argued that imprisoning him could deter others from cooperating with the government. However, it cannot be the case that every cooperator must be spared imprisonment, regardless of the nature and extent of their efforts. Defendant received substantial consideration for his assistance in this case. Defendant compared himself to the bus company operator, who also received a recommended 4-level departure from the government, despite significant problems with his assistance. The sentence I imposed on defendant in this case was a fraction of the 70 month sentence I imposed on the bus company owner.

15

not greater than necessary to satisfy the purposes of sentencing. This sentence was based on 18 U.S.C. § 3553(a) and would have been the same regardless of the guideline calculations. See United States v. Sanner, 565 F.3d 400, 406 (7th Cir. 2009).[7]

### III. CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for 12 months and 1 day. Based on his financial situation, I determined that he lacked the ability to pay and thus waived a fine. I ordered him to serve a three year term of supervised release, the conditions of which appear in the judgment.

Dated at Milwaukee, Wisconsin, this 9th day of October, 2012.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[7] I note that this sentence fell within the alternate range defendant proposed (using $200,000 as the "loss" amount), after departure.

16